2024 IL App (1st) 230640-U
Order filed: March 28, 2024

FIRST DISTRICT
FOURTH DIVISION

No. 1-23-0640

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| FAHAD NAZIR, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 L 8025 |
| | ) | |
| COOK COUNTY HEALTH AND | ) | Honorable |
| HOSPITAL SYSTEMS, | ) | Cahterine A. Schneider, |
| | ) | Judge, presiding. |
| Defendant-Appellee. | ) | |

_____

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Hoffman and Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*: Order granting summary judgment in favor of defendant is affirmed in part and reversed in part, where the majority of plaintiff's claims under the Illinois Whistleblower Act were either barred by the applicable statute of limitations or failed on the merits; however, one claim that plaintiff was improperly suspended without pay is remanded for further proceedings.

¶ 2    Plaintiff-appellant, Fahad Nazir, appeals from an order granting summary judgment in favor of defendant-appellee, Cook County Health and Hospital Systems. For the following reasons, we affirm in part and reverse in part and remand for further proceedings.

¶ 3    Plaintiff filed his complaint against defendant on July 29, 2020. Therein, plaintiff alleged that while he was employed by defendant, he suffered retaliation and ultimately termination of his

employment, in violation of the Illinois Whistleblower Act (Act). 740 ILCS 174/1 *et seq.* (West 2020).

¶ 4     More specifically, plaintiff's complaint alleged that he was a pharmacist, having obtained his pharmacy license in Illinois in 2009 and in Florida in 2011. He was hired by defendant as a Staff Pharmacist in 2011. Plaintiff was assigned to work at Cermak Health Services of Cook County (Cermak), a division of defendant located within a Cook County Department of Corrections (CCDOC) facility in Chicago, Illinois, which provided medical treatment exclusively to patients at the facility. Plaintiff's duties included dispensing medication orders, including controlled substances, to patients in accordance with applicable laws and regulations. However, after several years of working for defendant, plaintiff began to raise internal concerns with defendant—including formal union grievances—regarding his duties and responsibilities and other aspects of defendant's employment practices.

¶ 5     Plaintiff's complaint primarily contended that "per the Drug Enforcement Agency" (DEA), defendant's own "Interagency Directive on Medication Administration and Distribution," and the Illinois Pharmacy Practice Act (Pharmacy Act) (225 ILCS 85/3 (West 2020)), a distinction was made between "dispensing" and "administrating" controlled substances. According to the complaint, these sources generally provided that dispensing such controlled substances simply involved preparing and delivering a prescription for later use, while administering them involved physically providing medications to a patient for immediate use. Plaintiff asserted that from the beginning of his employment he was required by defendant to "administer" methadone and suboxone to patients. These two drugs were controlled substances and were being provided to certain patients as part of an opioid treatment program. After several years of employment, plaintiff began to make internal complaints to defendant that as a pharmacist he was not authorized by state

law or defendant's own policies to "administer," as opposed to "dispense," methadone and suboxone to patients. Beginning in May of 2019, plaintiff began to refuse to "administer" methadone and suboxone to patients.

¶ 6     Plaintiff also made internal complaints that: (1) the person serving as defendant's Pharmacy Supervisor at Cermak did not have the proper qualifications to hold that position, (2) he was improperly being required to, and ultimately refused to, complete a "Schedule 'L' form" regarding drug and alcohol abuse programs in order to comply with requirements of the Illinois Department of Human Services, (3) he had improperly been converted from a Staff Pharmacist to a Clinical Pharmacist by defendant without notification, training or an increase in pay, (4) a continuing education requirement mandated by defendant was improper, and (5) the way in which patients were being administered methadone and suboxone violated their rights under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) (Pub. L. No. 104-191, 110 Stat. 1936 (1996) (codified as amended in scattered sections of Titles 18, 26, 29, and 42 of the United States Code (2016))). None of plaintiff's internal complaints or union grievances with respect to these issues were addressed or resolved to plaintiff's satisfaction.

¶ 7     Thereafter, plaintiff began to raise these concerns externally. This included defendant's formal complaints to the Cook County Inspector General (CCIG), the Illinois Department of Financial and Professional Regulation (IDFPR), the United States Department of Health and Human Services, and the "Shakman Compliance Office." Plaintiff also filed a complaint with the Illinois Department of Human Rights (IDHR), asserting a claim of discrimination based upon his sex and national origin. While an IDFPR investigator conducted an onsite investigation on or about October 17, 2018, plaintiff's complaint alleged that all his external complaints ultimately "met to no avail."

¶ 8    However, plaintiff alleged that after "making internal and external complaints starting from August 2018, Management's treatment towards Plaintiff only worsened." Plaintiff alleged that after making his complaints, he suffered: (1) his first negative performance evaluation, (2) schedule changes, and (3) his first suspension, followed by two more suspensions for not completing continuing education requirements and for "refusing to administer methadone and suboxone."

¶ 9    Thereafter, on or around August 16, 2019, "Plaintiff provided counseling and printed material to Opioid Treatment Program patients. Plaintiff provided information that informed patients their health was at risk because pharmacists cannot administer methadone and suboxone." Three days later, "Plaintiff was escorted out of Defendant's premises for informing patients their rights were being violated having Pharmacists administer suboxone and methadone." Plaintiff was suspended for 29 days on or about August 19, 2019, although the complaint does not identify the exact reason for the suspension. On or about September 12, 2019, plaintiff's employment with defendant was terminated. According to the complaint, the "reason given for his termination was that Plaintiff had not followed management's orders to dispense methadone and suboxone in August of 2019, and that Plaintiff had distributed literature to inmates that their rights were being violated." Plaintiff's appeal of his termination was denied.

¶ 10    Plaintiff's complaint cited to the Act, which in relevant part prohibits an employer from retaliating against an employee for: (1) "disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation" (740 ILCS 174/15(b) (West 2020)), or (2) "refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation" (740 ILCS 174/20 (West 2020)). Contending that his first negative

- 4 -

performance evaluation and his first suspension came within months of his complaints about the administration of methadone and suboxone, all his suspensions were without pay, and despite his best efforts he had yet to "find gainful employment since his time with Defendant" ended in his termination, plaintiff's complaint sought to recover damages under the Act. See 740 ILCS 174/30 (West 2020) ("If an employer takes any action against an employee in violation of Section 15 or 20, the employee may bring a civil action against the employer for all relief necessary to make the employee whole.").

¶ 11    Defendant filed an answer denying the material allegations of the complaint, as well as three affirmative defenses. Those affirmative defenses included assertions that: (1) plaintiff's claims were barred by the applicable statute of limitations, including the one-year limitation contained in the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act). 745 ILCS 10/8-101(a) (West 2020), (2) plaintiff failed to fully mitigate his damages, and (3) to the extent plaintiff's claims were premised upon the discrimination complaint he filed with the IDHR, such claims were preempted by the Illinois Human Rights Act. See 775 ILCS 5/1-101 *et seq*. (West 2020). The record on appeal contains no indication that plaintiff ever filed a response to these affirmative defenses.

¶ 12    Defendant thereafter filed a motion for summary judgment. Therein, defendant first asserted that because plaintiff filed his complaint on July 29, 2020, any acts of retaliation alleged to have occurred prior to July 29, 2019—which included all the allegations in the complaint other than plaintiff's August 19, 2019, suspension and his September 12, 2019, termination—were untimely under the one-year limitation contained in the Tort Immunity Act. Defendant also asserted that defendant could not meet his burden of proof under the Act where the undisputed facts showed that: (1) plaintiff could not have had a reasonable belief that defendant's procedures

regarding methadone and suboxone were improper after the October 17, 2018, inspection by the IDFPR investigator, (2) there was no evidence that plaintiff refused to participate in an activity that *actually violated* any state or federal law, rule, or regulation, (3) plaintiff was actually terminated due to his unauthorized communications with patients, which caused his access to the facility to be revoked, and (4) plaintiff's discrimination claim was preempted by the Illinois Human Rights Act. Supporting exhibits attached to defendant's motion included: (1) the signed declaration of Mary Ann Wrobel, the Director of Pharmacy for defendant's Cermak facility, (2) the transcript of plaintiff's deposition testimony, and (3) nine exhibits identified at and discussed during plaintiff's deposition.

¶ 13    Plaintiff filed a written response to defendant's motion for summary judgment, to which he attached 17 exhibits as supporting evidence. These exhibits purported to be copies of: (1) the internal and external written complaints plaintiff filed, (2) plaintiff's internal and external correspondence related to his complaints, (3) the results and findings of the IDFPR onsite investigation, (4) two excerpts of what appears to be Wrobel's deposition testimony, (5) a Cook County Interagency Directive on Medication Administration and Distribution, and (6) several of defendant's other internal policies and procedures. However, the record includes no indication that any of these documents were authenticated in any way.

¶ 14    After defendant's motion was fully briefed by the parties, the circuit court entered an order granting summary judgment in defendant's favor on March 9, 2023. In its order, the circuit rejected defendant's assertion of preemption under the Illinois Human Rights Act. However, the circuit agreed that all the allegations of retaliation alleged in the complaint other than plaintiff's August 19, 2019, suspension and his September 12, 2019, termination were barred by the one-year statute of limitations. With respect to those two remaining claims, the circuit court concluded that

plaintiff's "allegations are conclusory statements unsupported by fact, and in the absence of further evidence, Plaintiff has not established a genuine issue of material fact that supports a reasonable belief or actual violation of a law, rule, or regulation" to support his claims under the Act. For those reasons, the circuit granted summary judgment in favor of defendant on the entirety of plaintiff's complaint. Plaintiff filed a timely notice of appeal on April 7, 2023.

¶ 15    Summary judgment is properly granted where the pleadings, depositions, and admissions on file, together with any affidavits, indicate there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2–1005(c) (West 2022). The court must examine the evidence in the light most favorable to the nonmoving party (*Pavlik v. Wal–Mart Stores, Inc.*, 323 Ill. App. 3d 1060, 1063 (2001)), and must construe the material strictly against the movant and liberally in favor of the nonmovant (*Espinoza v. Elgin, Joliet and Eastern Railway Company*, 165 Ill. 2d 107, 113 (1995)). Although a drastic means of disposing of litigation, summary judgment is nonetheless an appropriate measure to expeditiously dispose of a suit when the moving party's right to the judgment is clear and free from doubt. *Gaston v. City of Danville*, 393 Ill. App. 3d 591, 601 (2009).

¶ 16    A "defendant moving for summary judgment bears the initial burden of production." *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The defendant may satisfy this "burden of production in two ways: (1) by affirmatively showing that some element of the case must be resolved in his favor, [citation omitted]; or (2) by establishing 'that there is an absence of evidence to support the nonmoving party's case.' " *Id*. When the defendant has met this initial burden, the burden shifts to "the plaintiff to present a factual basis which would arguably entitle her to a favorable judgment." *Id*. A plaintiff is not required to prove her case in response to the motion for

summary judgment, but must present evidentiary facts to support the elements of the cause of action. *Richardson v. Bond Drug Company of Illinois*, 387 Ill. App. 3d 881, 885 (2009).

¶ 17    An order granting a motion for summary judgment is subject to a *de novo* standard of review. *Millennium Park Joint Venture, LLC v. Houlihan*, 241 Ill. 2d 281, 309 (2010). As such, we perform the same analysis that a circuit court would and give no deference to the circuit court's conclusions or specific rationale. *Milevski v. Ingalls Memorial Hospital*, 2018 IL App (1st) 172898, ¶ 26. This court may, therefore, affirm the judgment of the circuit court on any basis that appears in the record, regardless of whether the circuit court relied upon that basis or whether the circuit court's reasoning was correct. *Retirement Plan for Chicago Transit Authority Employees v. Chicago Transit Authority*, 2020 IL App (1st) 182510, ¶ 34.

¶ 18    We begin by making several preliminary observations and conclusions. First, we note that "[e]vidence that would be inadmissible at trial is not admissible in support of or in opposition to a motion for summary judgment." *Complete Conference Coordinators, Inc. v. Kumon North America, Inc*., 394 Ill. App. 3d 105, 108 (2009). "In civil cases in Illinois, the basic rules of evidence require a proponent of documentary evidence to lay a foundation for the introduction of that document into evidence." *Anderson v. Human Rights Comm'n,* 314 Ill. App. 3d 35, 42 (2000). "Evidence must be presented to demonstrate that the document is what its proponent claims it to be." *Id*. at 42. "Without proper authentication and identification of the document, the proponent of the evidence has not provided a proper foundation and the document cannot be admitted into evidence." *Id*. This requirement may be met by providing an affidavit or by presenting testimony. *Cordeck Sales, Inc. v. Construction Systems, Inc.*, 382 Ill. App. 3d 334, 384 (2008).

¶ 19    Defendant met these requirements here, where the exhibits it attached to its motion for summary judgment consisted of: (1) the signed affidavit—identified as a "declaration"—of

Wrobel, (2) the transcript of plaintiff's sworn deposition testimony, and (3) nine exhibits used at plaintiff's deposition, authenticated by plaintiff's own deposition testimony. In contrast, the documents attached to plaintiff's response to the motion for summary judgment were not authenticated in any way. Plaintiff presented no affidavit or testimony laying a proper foundation for these documents or to demonstrate that the documents actually are what he claimed them to be. Therefore, we conclude that plaintiff may not rely upon these documents to oppose summary judgment in favor of defendant.

¶ 20    Second, we note that the relevant portions of the Act upon which plaintiff relies only protect an employee from retaliation related to actual violations, or the reporting of alleged violations, of a "*State or federal* law, rule, or regulation" (740 ILCS 174/15(b), 174/20 (West 2020)). (Emphasis added.) Nevertheless, both below and on appeal, plaintiff relies in part upon purported actual violations—and his reporting of alleged violations—of defendant's own internal policies, Cook County rules and regulations, and a Shakman consent decree involving Cook County hiring practices. However, none of these are *state or federal* laws, rules, or regulations, and therefore plaintiff cannot rely upon them to support his claims under the Act. *Id.*; *Cwik v. Manteno Community Fire Protection District*, 2024 IL App (3d) 230036-U, ¶ 36 ("To allege a violation of the Whistleblower Act, plaintiff had to allege *** a violation of a State or federal law, State or federal rule, or State or federal regulation.").[1]

¶ 21    In addition, while both below and on appeal defendant relies upon vague allusions to defendant's purported violation of HIPPA and the federal "DEA manual," or plaintiff's disclosure

---

[1] This case is cited as persuasive authority pursuant to Illinois Supreme Court Rule 23(e) (eff. Feb. 1, 2023), which provides that "a nonprecedential order entered under subpart (b) of this rule on or after January 1, 2021, may be cited for persuasive purposes."

of information he had reasonable cause to believe amounted to a violation of HIPPA and the DEA manual, plaintiff has never identified or provided any *specific* provisions of HIPPA or the DEA manual that were purportedly violated. However, summary judgment " 'is the put up or shut up moment in a lawsuit.' " *North Community Bank v. 17011 South Park Avenue, LLC*, 2015 IL App (1st) 133672, ¶ 15 (quoting *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 14). The party opposing summary judgment must therefore produce actual evidentiary facts that would enable a jury to return a favorable verdict—and " 'mere speculation, conjecture, or guess' " is insufficient. *Barrett v. FA Group*, LLC, 2017 IL App (1st) 170168, ¶ 26, (quoting *Sorce v. Naperville Jeep Eagle, Inc*., 309 Ill. App. 3d 313, 328 (1999)). In the absence of any evidence as to what specific provisions of HIPPA or the DEA manual were purportedly violated, we conclude that plaintiff may not rely upon any actual or purported violation of HIPPA or the DEA manual to oppose summary judgment in favor of defendant.

¶ 22    Next, plaintiff for the first time on appeal contends that the Pharmacy Act expands the protections of the Act, where it provides that any person who reports, among other things, a violation of the Pharmacy Act to the IDFPR "is protected under subsection (b) of Section 15 of the Whistleblower Act." 225 ILCS 85/30(h) (West 2020). Even if we were to consider the merits of this argument, raised for the first time on appeal, we note that this provision was not added to the statute and was not effective until after defendant was terminated. See Pub. Act 101-621 (eff. Dec. 20, 2019) (amending 225 ILCS 85/30(h)).

¶ 23    Our final preliminary observation is that, on appeal, plaintiff explicitly declines to challenge the circuit court's conclusion that all the allegations of retaliation alleged in the complaint—other than his August 19, 2019, suspension and his September 12, 2019, termination—

were barred by the applicable statute of limitations. Therefore, only these two allegations of alleged retaliation remain at issue on appeal.

¶ 24 Turning to plaintiff's August 19, 2019, suspension, we first reject plaintiff's claim that summary judgment was improperly granted to defendant with respect to any assertion that this suspension constituted improper retaliation under section 174/15(b) of the Act. There is simply no admissible evidence in the record to support a contention that this suspension resulted from plaintiff's disclosure of information to a government or law enforcement agency that plaintiff had reasonable cause to believe disclosed a violation of a State or federal law, rule, or regulation. 740 ILCS 174/15(b) (West 2020). Thus, we are left with nothing but plaintiff's unsubstantiated assertions to support this claim, and again "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce*, 309 Ill. App. 3d at 328.

¶ 25 Rather, the admissible and undisputed evidence contained in the record—which includes defendant's own deposition testimony and a "Disciplinary Action Form" documenting this suspension—clearly indicate that this suspension was based on plaintiff's refusal to "provide services to patients." Plaintiff's challenge to his August 19, 2019, suspension must therefore rise or fall on his contention that he was improperly suspended under section 174/20 of the Act for "refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." (740 ILCS 174/20 (West 2020).

¶ 26 As narrowed by our above discussion, plaintiff's sole remaining contention in this regard is that he was improperly suspended because he properly refused to "administer," as opposed to "dispense," methadone and suboxone to patients, where "administering" such controlled substances would be in violation of the Pharmacy Act. In support of this argument, plaintiff cites to section 85/3 of the Pharmacy Act, which defines the "Practice of pharmacy" and further provides

that a "pharmacist who performs any of the acts defined as the practice of pharmacy in this State must be actively licensed as a pharmacist under this Act." 225 ILCS 85/3(d) (West 2020). Among the acts included in the definition of the practice of pharmacy is "the dispensing of prescription drug orders." 225 ILCS 85/3(d)(2) (West 2020). The Pharmacy Act goes on to state that:

" 'Dispense' or 'dispensing' means the interpretation, evaluation, and implementation of a prescription drug order, including the preparation and delivery of a drug or device to a patient or patient's agent in a suitable container appropriately labeled for subsequent administration to or use by a patient in accordance with applicable State and federal laws and regulations. 'Dispense' or 'dispensing' does not mean the physical delivery to a patient or a patient's representative in a home or institution by a designee of a pharmacist or by common carrier. 'Dispense' or 'dispensing' also does not mean the physical delivery of a drug or medical device to a patient or patient's representative by a pharmacist's designee within a pharmacy or drugstore while the pharmacist is on duty and the pharmacy is open. 225 ILCS 85/3(m) (West 2020).

¶ 27    Also included in the practice of pharmacy is "drug administration." 225 ILCS 85/3(d)(4) (West 2020). Such administration is, however:

"limited to the administration of oral, topical, injectable, and inhalation as follows:

(A) in the context of patient education on the proper use or delivery of medications;

(B) vaccination of patients 14 years of age and older pursuant to a valid prescription or standing order, by a physician licensed to practice medicine in all its branches, upon completion of appropriate training, including how to address contraindications and adverse reactions set forth by rule, with notification to the patient's physician and appropriate

record retention, or pursuant to hospital pharmacy and therapeutics committee policies and procedures; and

> (C) administration of injections of alpha-hydroxyprogesterone caproate, pursuant to a valid prescription, by a physician licensed to practice medicine in all its branches, upon completion of appropriate training, including how to address contraindications and adverse reactions set forth by rule, with notification to the patient's physician and appropriate record retention, or pursuant to hospital pharmacy and therapeutics committee policies and procedures." 225 ILCS 85/3(d)(4) (West 2020).[2]

¶ 28    With these definitions in mind, we turn to plaintiff's deposition testimony in which he provides a description of how he was required to "administer" methadone and suboxone to patients while working for defendant. Notably, this description is unrebutted by any other evidence in the record. With respect to methadone, plaintiff described the process as follows:

> "I took the person's ID. I made sure that it was the correct patient, matching the SAMS computer terminal along with the Cerner software that matches a patient's information. Then what I did was, can you please verify your name and date of birth to the patient, and he said blah, blah, blah, whatever that person's name was and date of birth. So it was the correct person.
>
>     What I did was I proceeded to pressing the dispense button, whatever that dispense

---

[2] On appeal, plaintiff cites to and relies in part upon additional language defining "drug administration" to include the "administration of injections of long-acting or extended-release form opioid antagonists for the treatment of substance use disorder." 225 ILCS 85/3(d)(4)(B-5) (West 2020). Plaintiff asserts that this language did not give him authority to "administer" methadone and suboxone to patients while working for defendant, because those medications—while they are opioid antagonists—were provided by plaintiff to patients orally and not by injection. The language in subsection (B-5) is simply not relevant here, however, because it was not added to the statute and did not become effective until after plaintiff was terminated. See Pub. Act 101-349 (eff. January 1, 2020) (amending 225 ILCS 85/3).

button stated the amount of milligrams that that person was getting. So then the medication poured into the vial. I put a white cap on top of the vial and then I matched the label of the patient receiving the dose and I manually put in the amount of milligrams that the person was getting per methadone. Then she said—and then I proceeded over and I proceeded to the five rights of administration. I verified the right dose, the right drug, the right time, the right strength, the right patient, and then I said that I'm Fahad Nazir. I will be administering methadone to you. Then I initiated BCMA, which is bar code med administration, and I showed the patient that you're getting this amount, and he said okay. I also added water or juice to the methadone vial and shook it up to make sure that it's not too concentrated.

When I initiated BCMA, I scanned the ID, patient's ID, and then the methadone bottle, and that automatically charted methadone administration to the electronic medication administration record. I have to insure [*sic*] that I was putting it in the right time slot, whatever that time was that the patient came at, and then I said okay, sir, and then I opened the bottle for him. Then I said, please make sure you drink the entire thing completely. So he drank it completely, and then after he drank it completely, he swallowed it. *** I asked him to open the mouth and then I made sure that there was no liquid left and that he swallowed it completely. Then I took the bottle away from him, the vial."

¶ 29    With respect to suboxone, plaintiff described the process as follows:

"So then I grabbed the suboxone from the Pyxis cabinet where the strip is inside a little Ziploc bag. So then I took out the Ziploc bag which contains the suboxone strip with the patient's label affixed on the Ziploc bag. I closed the Pyxis cabinet and then I went over near the methadone terminal. I made sure that it was the right drug with the right patient's name and the right patient and the date of birth. I asked the patient what is your name and

date of birth, and they stated their name and date of birth. I then initiated the five rights of med administration. Then I also started BCMA which is bar code med administration. I scanned the patient's ID with the suboxone strips cover which has a bar code on it, and I scanned it and then when I scanned both those things, it automatically documented on the patient's electronic medication administration record. Then I insured [*sic*] that the administration was at the right time for whatever time that the patient came in.

I cut open the strip and said to please take the—I took the strip out and I perforated the line where you, you know, you cut it a little bit, and I said please take the strip out and put it underneath the tongue. Then I made sure that the person put it underneath [their] tongue. Then the patient was leaning against the wall and they waited the full 20 minutes for it to be dissolved, and then after it was fully dissolved 12 minutes, sorry, 20 minutes later, I asked the patient to do a mouth check and I asked them to open the mouth. I made sure that there was no strip remaining in the mouth, that there was no residual amount left, and there was no residual amount left. Then I said okay you're good to go."

¶ 30    We note again that on a motion for summary judgment we must examine the evidence in the light most favorable to the nonmoving party (*Pavlik*, 323 Ill. App. 3d at 1063), and must construe the material strictly against the movant and liberally in favor of the nonmovant (*Espinoza*, 165 Ill. 2d at 113). Furthermore, the "purpose of summary judgment is not to try a question of fact, but to determine whether a genuine issue of material fact exists." *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 305 (2005). "A triable issue precluding summary judgment exists where the material facts are disputed, or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts." *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004).

¶ 31    Based upon plaintiff's unrebutted description of how he was required to provide methadone and suboxone to patients, we find that reasonable people could draw different conclusions as to whether those activities constituted "dispensing" or "administrating" medication as defined by the Pharmacy Act, or whether under these circumstances plaintiff's activities in this regard were or were not authorized by the Pharmacy Act. As such, on these facts we cannot say as a matter of law that plaintiff was not suspended for "refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." (740 ILCS 174/20 (West 2020). We therefore conclude that summary judgment was improperly granted to defendant on plaintiff's claim that his August 19, 2019, suspension violated section 174/20 of the Act, because plaintiff was retaliated against for refusing to participate in an activity that would violate the Pharmacy Act. We therefore reverse that portion of the circuit court's order and remand for further proceedings on this claim.

¶ 32    We now turn to plaintiff's contention that his September 12, 2019, termination resulted from improper retaliation under the Act. We find it unnecessary to undergo an analysis similar to that above with respect to plaintiff's suspension, as we find alternative and independent reasons to affirm summary judgment in favor of defendant on this claim.

¶ 33    In seeking summary judgement on this claim, defendant asserted in part that plaintiff could not establish causation under the Act because he was actually terminated due to his unauthorized communications with patients, which caused his access to the facility to be revoked. While the circuit court did not rely upon this as a basis for its grant of summary judgment in favor of defendant, we reiterate that we may affirm the judgment of the circuit court on any basis that appears in the record, regardless of whether the circuit court relied upon that basis. *Chicago Transit Authority*, 2020 IL App (1st) 182510, ¶ 34.

¶ 34    Under both sections 174/15(b) and 174/20 of the Act, a plaintiff must establish that an employer's retaliation—in this case, termination of plaintiff's employment—resulted from protected conduct. 740 ILCS 174/15(b), 174/20 (West 2020). "The requirement that the discharge be in retaliation for an employee's activities requires that a plaintiff establish a causal relationship between the employee's activities and the discharge." *Brummel v. Grossman*, 2018 IL App (1st) 170516, ¶ 49. " 'The element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee.' " *Id.* (quoting *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 160 (1992).

¶ 35    Here, plaintiff's complaint itself alleges that: (1) on or around August 16, 2019, he "provided counseling and printed material to Opioid Treatment Program patients. Plaintiff provided information that informed patients their health was at risk because pharmacists cannot administer methadone and suboxone," (2) three days later, plaintiff "was escorted out of Defendant's premises for informing patients their rights were being violated by having Pharmacists administer suboxone and methadone," and (3) the reasons given by defendant for plaintiff's termination included that plaintiff "had distributed literature to inmates that their rights were being violated by defendant." In its answer to these allegations in plaintiff's complaint, defendant admitted that : (1) "Plaintiff provided unauthorized printed materials to opioid treatment patients," (2) "Plaintiff was escorted out of the Cook County Department of Corrections on August 19, 2019, after engaging in unauthorized and inappropriate communication with patients in violation of multiple County rules, policies, and procedures," and (3) "Plaintiff's employment was terminated for engaging in improper, unauthorized, and unsanctioned, written and verbal communications with patients enrolled in the opioid treatment program in violation of Defendant's personnel rules and policies, the Cook County Department of Corrections Code of Conduct, as

well as management directives."

¶ 36    Thus, the complaint itself alleged that plaintiff engaged in these activities and that defendant provided a justification for its decision to terminate plaintiff that does not on its face violate the Act, and defendant's answer to the complaint does not indicate otherwise. In addition, the exhibits provided by defendant in its briefing on the motion for summary judgment— specifically plaintiff's deposition testimony and the disciplinary records related to plaintiff's termination—show that it is in fact undisputed that plaintiff communicated with patients regarding his concerns with respect to the administration of methadone and suboxone and that this activity was specifically referenced by defendant as justification for plaintiff's termination. Again, the element of causation in a claim under the Act is not met if the employer has a valid basis for discharging an employee. *Brummel*, 2018 IL App (1st) 170516, ¶ 49.

¶ 37    Nor did plaintiff's complaint contain any allegation that any such proffered reason was merely a pretext for defendant's actual intent to retaliate against plaintiff for conduct protected under the Act. It was not until he responded to defendant's motion for summary judgment that plaintiff raised the argument that: (1) this justification was "merely a pretext for Defendant's true motivation," (2) "the stated reason for his termination is pretext because the [activity] Plaintiff was engaging in (alerting inmates of their rights) was the exact behavior Plaintiff contends was his whistleblowing activity," and (3) a "legitimate, nonretaliatory reason for termination cannot be based on retaliation for engaging in protected activity." Plaintiff makes similar arguments on appeal.

¶ 38    However, "a response to a motion for summary judgment is not the proper vehicle to assert new factual allegations that should have been included in the underlying complaint. 'When ruling on a motion for summary judgment, the trial court looks to the pleadings to determine the issues

in controversy. [Citation.] If a plaintiff desires to place issues in controversy that were not named in the complaint, the proper course of action is to move to amend the complaint.' " *Abramson v. Marderosian*, 2018 IL App (1st) 180081, ¶ 55 (quoting *Filliung v. Adams*, 387 Ill. App. 3d 40, 51 (2008). There are simply no allegations of fact contained in the complaint regarding any alleged pretext. Thus, it is improper for plaintiff to rely upon any assertion of pretext in opposition to the grant of summary judgment in favor of defendant as to plaintiff's challenge to his termination.

¶ 39    Even if we were to further consider plaintiff's assertion of pretext, we note that plaintiff again offers only speculation and cites to no admissible evidence in support of his contention that the otherwise valid, proffered reason for his termination was in fact merely a pretext under the Act. Again, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce*, 309 Ill. App. 3d at 328. Moreover, we reject plaintiff's contention that his communication with patients was somehow also protected activity under the Act. As discussed above and as relevant here, the Act specifically protects an employee from being retaliated against for certain disclosures to a government or law enforcement agency or for "for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 ILCS 174/15(b), 174/20 (West 2020). Plaintiff's communication with *patients* regarding his concerns is not activity protected under the plain language of the Act.

¶ 40    For the foregoing reasons, the judgment of the circuit court is affirmed in part and reversed in part and this matter is remanded for further proceedings.

¶ 41    Affirmed in part and reversed in part.

¶ 42    Cause remanded.